IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| STEPHEN R. SMITH | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. SA 04 CA 303-XR |
| | § | |
| BCE INC. and BCE VENTURES INC., | § | |
| | § | |
| Defendants | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Stephen R. Smith ("Smith") files his First Amended Complaint complaining of Defendants BCE Inc. and BCE Ventures Inc. (collectively "BCE"), as follows:

### Parties

1. Smith is an individual residing in Kerr County, Texas.

2. BCE Inc. is a Canadian corporation which has been served and has answered herein.

3. BCE Ventures Inc. is a Canadian corporation which has been served and has answered herein.

### Jurisdiction and Venue

4. Smith disputes that this Court has jurisdiction for the reasons set out in his Motion to Remand, which motion has been overruled by this Court. If, however, the Motion to Remand was properly overruled, then this Court has jurisdiction because there is complete diversity between the parties and the amount in controversy, exclusive of costs, exceeds the minimum jurisdictional limits of this Court.

PLAINTIFF'S FIRST AMENDED COMPLAINT – PAGE 1

5.  If, however, this Court has jurisdiction, then venue is proper in this District and Division because Smith, a citizen of Texas, resides in such district and division.

### No Waiver

6.  By filing this First Amended Complaint, Smith does not waive the contentions, arguments and claims set out in his Motion to Remand, Motion for Leave to File His First Amended Complaint, and his pleaded claims against Excel Telecommunications, Inc.

### Facts Applicable to All Counts

7.  Smith is a 59 year old businessman who grew up in El Paso and attended the University of Texas. After school and several years of experience in network marketing, he joined Excel in 1989 to develop a marketing system and soon became a stockholder, officer and director of the company. In 1989, he and Excel entered into the "1989 agreement"[1] which provided him with ongoing commissions on business generated, and to be generated in the future, by a marketing system which he had developed and was continuing to develop. His marketing efforts were extremely successful, and both he and Excel enjoyed a mutually profitable relationship for many years while operating under the agreement.

8.  Excel enjoyed several years of solid, substantial growth, and in November of 1998, Smith and the other stockholders exchanged their Excel stock for publically traded Teleglobe stock. As a result of the stock exchange, Excel became a wholly owned subsidiary of Teleglobe, then owned 23% by BCE which was Teleglobe's largest customer. Teleglobe had several subsidiaries, but its primary business was that of constructing a new, globally integrated video, internet, data and

---

[1]  A copy of the 1989 agreement and the 1996 and 1997 amendments to that agreement are attached to Smith's Original Petition as Exhibits A, B and C and incorporated by reference in this Complaint.

PLAINTIFF'S FIRST AMENDED COMPLAINT – PAGE 2

voice network, known as the GlobeSystem network, at a projected cost of almost $5 billion dollars. Most of Teleglobe's management efforts were devoted to raising money and bringing the system online. In 1998 and 1999, Teleglobe spent almost $1 billion on the system, most of which was raised by selling assets and borrowing money. Even so, by the end of 1999, the remaining projected cost to completion was still over $2 billion.

9. In early 2000, TeleGlobe and BCE reached agreements for BCE to acquire the rest of the Teleglobe stock which it did not already own, and for BCE to provide Teleglobe with a loan of $100M along with a commitment for continuing financial assistance of an additional $900M. At the same time, BCE assumed control of Teleglobe and elected three BCE insiders to the five member Teleglobe board of directors. The BCE/Teleglobe deal closed in November, 2000, at which time Smith exchanged his Teleglobe stock for BCE stock and resigned from the Excel and Teleglobe boards of directors. After November, his role with Teleglobe and Excel was limited to his involvement with Excel's marketing program, which was still paying him commissions of about $2 million per year.

10. Starting in late 2000, Smith began dedicating a significant amount of time, energy and money to preserving and diversifying the value of his BCE stock. He hired a full time staff consisting of a CFO, a house counsel, several other professionals, and several administrative personnel. He and his staff undertook to keep themselves actively informed about the operations and financial condition of BCE, Teleglobe, and Excel; to stay abreast of economic conditions affecting BCE and the market for the BCE stock; to keep informed as to developments which could affect Excel's payments under the 1989 agreement; and to make appropriate business decisions to optimize and preserve both the revenues under the 1989 contract and the value of the BCE stock. In the course of their activities, they acquired, analyzed and evaluated national and industry

PLAINTIFF'S FIRST AMENDED COMPLAINT – PAGE 3

economic publications, stockholder reports published by Teleglobe and BCE, information acquired from contacts with the companies, information acquired from investment banking firms and stock analysts, industry reports on market conditions, and various other sources of information. They considered numerous alternatives and made a few investments based upon their evaluations of the future of BCE, its subsidiaries, and the market for its stock. Thus, BCE's business and the market for its stock were, during the times pertinent to this case, of the utmost importance to Smith and his family.

11.   The first contact which led to the third amendment to the 1989 agreement came in December, 2000 from Bill Anderson, a BCE officer and the president of a BCE subsidiary, who telephoned Smith for a meeting about an important, but undisclosed, subject. Smith knew Anderson from his tenure as a Teleglobe director, and knew him to be the former CFO of BCE and an insider who operated within the highest circles of BCE's management. After several unsuccessful attempts, they finally met at Smith's ranch in Kerrville in March, 2001. During that meeting, Anderson informed Smith that BCE intended to sell Excel to an undisclosed purchaser, and that as a condition to the sale, BCE needed to secure a release of Excel from the 1989 agreement. Smith replied that he was agreeable to terminating the contract only if he could be paid off in cash. Anderson assured him that cash was no problem, and they agreed to pursue further negotiations on that basis.

12.   Anderson returned to Canada and a few weeks later, BCE made Smith a cash offer of $10 million to release the contract. Smith countered with an offer of $25M in cash and BCE stock. BCE made another offer, they negotiated for several days, then agreed to a price of $22 million to be paid in cash over five years if documents could be drafted which satisfied Smith that he would be assured of payment and the payout agreement would be bankable. Smith's suggestion to assure payment was for BCE to supply a guaranty. Anderson replied that BCE could not directly

PLAINTIFF'S FIRST AMENDED COMPLAINT – PAGE 4

guarantee the deferrals, but that it would have Teleglobe supply its guaranty. Smith expressed concern because of Teleglobe's large future capital requirements. Anderson replied that, for the term of the deferred payments, Teleglobe was the same as BCE because although it was not stated as such to the public, BCE was committed to support Teleglobe for as long as it took to complete the GlobeSystem network and have it up and running. He told Smith that BCE had made the decision that it was not going to walk away from its $16 billion investment in Teleglobe, and that it was going to continue to support TeleGlobe beyond the term of the existing financial support arrangements. Anderson's status as a BCE insider negotiating on behalf of BCE made his reassurances believable, and Smith accepted them as true.

13.     The veracity of Anderson's representations and reassurances was bolstered by BCE's and Teleglobe's recent public disclosures to stockholders and the financial community that Teleglobe's 2001 capital expenditures would exceed $1B, which was more than the existing BCE financial support agreement, and that Teleglobe had recently entered into several significant agreements for long term future operations. Those representations and assurances were confirmed as true by BCE's chief executive officer, Jean Monty, who stated in a public analysts' conference call that "There is no question that we [BCE] are ready to finance the Teleglobe program. We will put our resources behind the Teleglobe program...we didn't come into this business for a one or two year payback. We really fully realized all along that this was a long-term payback business. Let me reiterate, the capital program is $3.4 ....We are committed to help Teleglobe finance the whole thing. So there is no quivering about that, there's no misunderstanding I hope between all of us, we'll get it done...."

14.     Smith and his staff were well aware of the public disclosures and Monty's statements. Smith also knew from his tenure as a Teleglobe director that Teleglobe could not have made or

PLAINTIFF'S FIRST AMENDED COMPLAINT – PAGE 5

disclosed such significant future capital commitments without the active approval of the BCE insiders, including Monty, who controlled Teleglobe's board of directors. After careful consideration, Smith agreed to accept the Teleglobe guaranty in reliance upon Anderson's representations and assurances, as supported and confirmed by the acts and statements of BCE and Teleglobe.

15. Once the guaranty issue was resolved, the parties began drafting the third amendment to the 1989 contract and the Teleglobe guaranty. Smith and his staff handled his part of the negotiations and document work. All of the drafting and negotiations on the BCE/Excel end of the deal were handled by BCE. The first proposed draft of the third amendment, which was prepared by BCE, was silent as to the right of Excel to "assign" the 1989 agreement. Subsequent drafts, also drafted by BCE, morphed through various proposals and ended up providing that the contract could be "assumed" by either BCE or Teleglobe, an arrangement consistent with Anderson's representations that, for purposes of the guaranty, the two companies were one and the same. The final agreement also provided that Smith could assign the deferred payments to a financial institution as collateral for a loan, a provision inserted to satisfy his requirement that the deferral be creditworthy.

16. The preparation of the guaranty, however, was more complicated. BCE's first proposed draft identified Teleglobe Holdings, Inc. as the guarantor, not Teleglobe, Inc, as had been agreed by Smith and Anderson, a suggestion apparently made in error by a BCE staff member. Smith rejected the proposal and threatened to terminate the negotiations. Anderson immediately contacted Smith, once again reaffirmed his prior statements about Teleglobe's financial status in order to reassure Smith that nothing was wrong, and assured him that Teleglobe, Inc. would provide the guaranty just as BCE had agreed that it would. He assured Smith that "BCE was 100% behind

PLAINTIFF'S FIRST AMENDED COMPLAINT – PAGE 6

Teleglobe" and that Smith did not have to "worry about Teleglobe." The guaranty was then completed with Teleglobe, Inc. as the guarantor.

17.  In May, 2001, Anderson disclosed to Smith for the first time that the purchaser of Excel was to be VarTec, a Dallas based company. He arranged to meet with Smith at VarTec's offices in Dallas, showed him around, and introduced him to several of the VarTec principals. During that meeting, he and Smith had private conversations during which Anderson updated Smith on the progress of the GlobeSystem network and reaffirmed BCE's commitment to Teleglobe to finance the completion of the system. Once again, Anderson's representations and assurances were consistent with BCE and Teleglobe's latest public disclosures.

18.  The deal was closed in August, 2001. Excel participated in the transaction by executing the third amendment at BCE's instructions and for the purpose of benefitting Excel as well as BCE. The first payment under the agreement was made to Smith in late August. Within weeks, Smith pledged the deferred payments under the amended agreement to Citibank to secure a large loan for business purposes.

19.  In April, 2002, the sale of Excel to VarTec was completed and, as part of the sale, Excel "assigned" the amended 1989 agreement to Teleglobe. When it executed the assignment, Excel was aware of the same facts as were known to BCE, yet failed to disclose them to Smith. Smith would have objected to the assignment had Excel disclosed the truth to him. Within a matter of days, BCE announced that it was withdrawing financial support from Teleglobe, and within a few weeks after that announcement, Teleglobe was in bankruptcy. Since then, Excel has refused to honor the contract, taking the position that it was relieved of liability by the third amendment and the "assignment" of the 1989 agreement to the bankrupt Teleglobe. Excel has, and is,

PLAINTIFF'S FIRST AMENDED COMPLAINT – PAGE 7

notwithstanding its knowledge of, and participation in, BCE's fraud, continuing to enjoy the benefit of such fraud by refusing to make its payments under the 1989 agreement.

20. BCE has now publically denied that it ever committed to support Teleglobe beyond the $900 million financial support agreement. Taking BCE's denial as true, Anderson's representations and assurances regarding those commitments were false as a matter of law.

### Count One – Fraud, Deceit, Misrepresentations and Omissions Against BCE

21. Smith realleges and incorporates paragraph 1 through 20 in this Count One.

22. BCE made material misrepresentations and omissions to Smith, which material misrepresentations and omissions included both misrepresentations of existing facts, expressions of opinion about which BCE's representative purported to have special knowledge of facts, half truths, and statements which if literally true were used to create false impressions. Such misrepresentations and omissions were false and deceitful, were made to induce Smith's reliance, and did in fact induce such reliance in securing his consent to the third amendment to the 1989 Excel agreement, all to his detriment and damage. The misrepresentations and omissions include, but are not limited to, false statements of fact, misleading impressions and half truths regarding (i) the financial ability of Teleglobe to perform its guaranty of the third amendment to the 1989 Excel agreement, (ii) the existence of a commitment by BCE to provide ongoing financial support and backing to Teleglobe beyond that which had been disclosed to the public, (iii) BCE's commitment to make additional investments in Teleglobe, and (iv) the failure to disclose that BCE was considering, or had already decided, to either decline to extend its financial support past the then existing levels or to withdraw such additional financial support in the future.

23. BCE's misrepresentations, half truths, misleading impressions and omissions were material, concerned matters solely within their knowledge, and concerned matters about which they knew Smith did not have knowledge of the truth of the facts and did not have an equal opportunity to discover either the facts or the truth of the facts.

24. Such misrepresentations, half truths, misleading impressions and omissions were half truths and partial representations so that full disclosure of the full truth was necessary in order for the full truth to be known and to prevent false impressions.

25. As a direct and proximate result of BCE's misrepresentations, half truths, misleading impressions and omissions, Smith suffered injury and actual damages in an amount of approximately $20 million for which Smith seeks judgment of both BCE parties, jointly and severally.

### Count Two – Negligent Misrepresentation Against BCE

26. Smith realleges and incorporates paragraphs 1 through 25 in this Count Two.

27. In the alternative, such misrepresentations and omissions, false statements of fact, misleading impressions and half truths, which include but are not limited to those pertaining to (i) the financial ability of Teleglobe to perform its guaranty to the third amendment to the 1989 Excel agreement, (ii) the existence of a commitment by BCE to provide ongoing financial support and backing to Teleglobe beyond that which had been disclosed to the public, (iii) BCE's commitment to make additional investments in Teleglobe, and (iv) the failure to disclose that BCE was considering, or had already decided, to either decline to extend its financial support past the then existing levels or to withdraw such additional financial support in the future (i) were negligent, (ii) were made by BCE in the course of a transaction in which it had a pecuniary interest, (iii) involved the supplying by BCE of false information for Smith's guidance in his business, (iv) involved a failure by BCE to exercise reasonable care or competence in obtaining or communicating such

information, and (v) resulted in a pecuniary loss to Smith who justifiably relied upon the misrepresentations, half truths, misleading impressions and omissions.

28.  As a direct and proximate result of BCE's negligent misrepresentations, half truths, misleading impressions and omissions, Smith suffered injury and actual damages in an amount of approximately $20 million for which Smith seeks judgment of both BCE parties, jointly and severally.

## Demand for Relief

WHEREFORE, Plaintiff Stephen R. Smith prays that Defendants be cited to appear and answer, and that upon trial on the merits, he have judgment as follows:

1. Judgment against the BCE Defendants, jointly and severally, as set out in Counts One and Two;

2. For all costs of court; and

3. For such other and further relief, both general and special, at law and in equity, to which he may show himself entitled.

Respectfully submitted,

KOLODEY, THOMAS, BLACKWOOD,
  & THOMAS, L.L.P.
5910 N. Central Expressway
700 Premier Place
Dallas, Texas 75206
(214) 953-0000
(214) 953-0006 - FAX

By: _____
Tom Thomas
  TX Bar No. 19870000
Beth Ann Blackwood
  TX Bar No. 12789140

Emerson Banack, Jr.
TX Bar No. 01667000
LANGLEY & BANACK INCORPORATED
Suite 900 - Trinity Plaza II
745 East Mulberry
San Antonio, Texas 78212-3166
(210) 736-6600
(210) 736-6889 - FAX

ATTORNEYS FOR PLAINTIFF

**Certificate of Service**

This is to certify that true and correct copies of the foregoing instrument were forwarded in the United States Mail, certified mail, return receipt requested and postage prepaid, to Matthew P. Whitley, Beck, Redden & Secrest, L.L.P., One Houston Center, 1221 McKinney, Suite 4500, Houston, Texas 77010-2010 on this 10th day of November, 2004.

_____
Tom Thomas